Slip Op. 21-37

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| REBAR TRADE ACTION COALITION,<br><br>               Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>     and<br><br>ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI A.S.,<br><br>               Defendant-Intervenor. | Before: Mark A. Barnett, Chief Judge<br>Court No. 20-00071<br><br>**Public Version** |

## OPINION

[Sustaining the U.S. Department of Commerce's final results in the first administrative review of the antidumping duty order on steel concrete reinforcing bar from the Republic of Turkey.]

Dated: April 6, 2021

John R. Shane, Wiley Rein, LLP, of Washington, DC, argued for Plaintiff. With him on the brief was Maureen E. Thorson.

Ann C. Motto, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were Jeffrey B. Clark, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was David W. Richardson, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Matthew M. Nolan and Leah N. Scarpelli, Arent Fox, LLP, of Washington, DC, argued for Defendant-Intervenor.

Barnett, Chief Judge:  The agency determination at issue here is the first administrative review of the antidumping duty order on steel concrete reinforcing bar ("rebar") from the Republic of Turkey ("Turkey").  While most administrative reviews cover a 12-month period preceding the anniversary month of the order, the first administrative review of an order may cover a longer period, beginning with the preliminary determination in the investigation and ending on the last day of the month before the first anniversary of the order.  In this case, the first administrative review covered a 16-month period of review.

In order to determine whether dumping occurred during this period, the U.S. Department of Commerce ("Commerce" or "the agency") compares U.S. price to normal value.  Normal value is generally based on home market sales, subject to various conditions.  One of those conditions involves determining whether the home market sales were made at prices that were less than the cost of production.  For these purposes, Commerce often uses costs averaged over the entire period of review, unless there are significant cost variations and those variations are linked to changes in sales prices.  When those conditions are met, Commerce will normally use quarterly costs[1] in its cost analysis rather than period-wide average costs.

Here, Commerce addressed a situation in which the respondent argued that there were significant cost variations linked to price changes such that quarterly costs

---

[1] Commerce refers to the three-month periods as quarters, however, the periods do not necessarily correlate to calendar quarters.  Instead, Commerce begins the first quarter with the first month of the period of investigation or review.  The court similarly refers to these three-month periods as quarters.

should be used in Commerce's dumping analysis, but the period of review did not divide evenly into three-month quarters. Rather, the 16-month period of review was divided into five three-month quarters and one remaining month, which Commerce determined to treat as the sixth quarter. When analyzing the costs based on those quarters, Commerce found that the variations exceeded its threshold for deviating from period-wide cost averages and used the reported quarterly costs. It is against this backdrop that the instant case arises.

Plaintiff Rebar Trade Action Coalition ("RTAC") moves, pursuant to United States Court of International Trade Rule 56.2, for judgment on the agency record, challenging Commerce's final results in the first administrative review of the antidumping duty order on rebar from Turkey for the period of review March 7, 2017, to June 30, 2018.[2] *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 15,765 (Dep't Commerce Mar. 19, 2020) (final results of antidumping duty admin. review; 2017–2018) ("*Final Results*"), ECF No. 20-4, and accompanying Issues and Decision Mem., A-489-829 (Mar. 13, 2020) ("I&D Mem."), ECF No. 20-5.

RTAC challenges Commerce's cost averaging methodology and reliance on one month's data for one of the quarters for purposes of determining whether to depart from using period-wide average costs in its antidumping analysis for Defendant-Intervenor

---

[2] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 20-1, and a Confidential Administrative Record ("CR"), ECF No. 20-2. Parties submitted joint appendices containing record documents cited in their briefs. *See* Public J.A. ("PJA"), ECF No. 38; Confidential J.A. ("CJA"), ECF No. 39. The court references the confidential versions of the relevant record documents unless indicated otherwise.

Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas"). *See* Confidential [RTAC]'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 26, and accompanying Confidential [RTAC]'s Mem. in Supp. of its Rule 56.2 Mot. for J. Upon the Agency R. ("RTAC's Mem."), ECF No. 26-1;[3] Confidential Reply Br. of Pl. [RTAC] ("RTAC's Reply"), ECF No. 35. Defendant United States ("the Government") and Icdas filed responses supporting the *Final Results*. *See* Confidential Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. ("Gov't's Resp."), ECF No. 31; Confidential Resp. Br. of Def.-Int. [Icdas] to Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("Icdas's Resp."), ECF No. 33.

For the following reasons, the court denies RTAC's motion and sustains Commerce's *Final Results*.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)[4] and 28 U.S.C. § 1581(c) (2018). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## BACKGROUND

Commerce initiated this first administrative review on September 10, 2018, *see Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 45,596, 45,604 (Dep't Commerce Sept. 10, 2018), PR 10, CJA Tab 1, and selected

---

[3] On September 4, 2020, the court granted RTAC's motion for errata to correct a citation in its brief. *See* Order (Sept. 4, 2020), ECF No. 30.
[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

Icdas and Kaptan Demir Celik Endüstrisi ve Ticaret A.S. ("Kaptan Demir") as mandatory respondents, *see* Respondent Selection for the Antidumping Duty Admin. Review of Steel Concrete [Rebar] from [Turkey] (Oct. 30, 2018) at 5, CR 3, PR 13, CJA Tab 2.

In response to section D of Commerce's initial questionnaire, Icdas requested "a quarterly comparison of prices as well as usage of quarterly costs in its margin calculation."  Questionnaire Resp. of [Icdas] and its Affiliates to Sec. D of the [Agency's] Antidumping Duty Questionnaire (Feb. 5, 2019) ("DQR") at D-11, CR 143–72, PR 43–44, CJA Tab 4.  Icdas explained that costs for three significant inputs consumed in producing rebar changed substantially during the period of review.  *See id.*  Icdas reported its monthly consumption and associated costs for inputs consumed in producing the top-five selling CONNUMs[5] in the U.S. and home markets.  *See id.*, Ex. D-4; Suppl. Sec. D Questionnaire Resp. of [Icdas] and its Affiliates, (July 22, 2019) ("SDQR") at S2-1, Ex. S2-1, CR 351–73, PR 147, CJA Tab 7.  Icdas also reported the total cost of manufacturing and total direct material costs for each CONNUM, broken down by quarters, and identified the changes between the highest and lowest quarters for those costs.  *See* DQR, Ex. D-4; SDQR, Ex. S2-2.  Icdas broke down its costs into the following periods:

> Quarter One: March 2017–May 2017;
> Quarter Two: June 2017–August 2017;
> Quarter Three: September 2017–November 2017;
> Quarter Four: December 2017–February 2018;

---

[5] CONNUM refers to "control number," which is a number designed to reflect the "hierarchy of certain characteristics used to sort subject merchandise into groups" and allow Commerce to match identical and similar products across markets.  *Bohler Bleche GmbH & Co. KG v. United States*, 42 CIT ___, ___, 324 F. Supp. 3d 1344, 1347 (2018).

Court No. 20-00071                                                                                              Page 6

>   Quarter Five: March 2018–May 2018; and
>   Quarter Six: June 2018.

See SDQR at S2-1.  Quarter six contained cost information only for June 2018, the last month of the period of review.  See id.  RTAC objected that the June 2018 data were unsuitable for consideration as representative of a full quarter in the quarterly cost averaging analysis.  [RTAC's] Pre-Prelim. Results Cmts. on [Icdas] (Aug. 9, 2019) at 13–14, CR 376, PR 154, CJA Tab 9.

    For the *Preliminary Results,* Commerce adopted Icdas's proposed quarterly cost breakdown for the antidumping analysis.  See Decision Mem. for Prelim. Results of Antidumping Duty Admin. Review, A-489-829 (Sept. 6, 2019) ("Prelim. Decision Mem.") at 14, PR 167, CJA Tab 11.  Commerce explained that the difference "between [Icdas's] high and low quarterly [costs of manufacturing] during the [period of review]" exceeded the threshold required to rely on quarterly averages.  *Id*. at 14 & n.60 (citations omitted).[6]  Commerce also found a link between "changing sales prices and costs during the [period of review]." *Id*. at 14 & n.65 (citations omitted).  Thus, Commerce relied on quarterly cost averages to determine Icdas's cost of manufacturing.  *Id*. at 14.  Commerce preliminarily calculated margins of 1.57 percent for Icdas, 0.91 percent for

---

[6] For a 12-month period, Commerce normally uses a 25 percent threshold to determine whether "the changes in [cost of manufacturing] are significant enough to warrant a departure from [its] standard annual-average approach."  Prelim. Decision Mem. at 14 & n.58 (citation omitted); *see also Habaş Sinai ve Tibbi Gazlar Istihsal Endustrisi A.Ş. v. United States*, 43 CIT ___, ___, 361 F. Supp. 3d 1314, 1324 (2019) (discussing the circumstances under which Commerce departs from relying on period-wide average costs).  In this case, Commerce used a 37.5 percent threshold because the period of review consisted of six quarters.  Prelim. Decision Mem. at 14 n.59.

Kaptan Demir, and 1.41 percent for the non-individually-examined respondents. *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 84 Fed. Reg. 48,588, 48,589 (Dep't Commerce Sept. 16, 2019) (prelim. results of antidumping duty admin. review; 2017–2018), PR 183, CJA Tab 14.

RTAC challenged Commerce's acceptance of the June 2018 data as the sixth quarter data. Pet'r's Case Br. (Feb. 11, 2020) ("RTAC's Case Br.") at 13–19, CR 417–18, PR 198, CJA Tab 15. RTAC contended that Commerce prefers quarterly averages to monthly averages in determining whether to depart from using a single, period-wide cost average "to ensure the change in cost is sustained for a reasonable time rather than for only an isolated month or two." *Id*. at 18 & n.62 (citation omitted). RTAC further argued that distortions in the June 2018 data demonstrated that Commerce's reliance on the data was unreasonable. *See id*. at 14–17.

For the *Final Results*, Commerce continued to rely on quarterly averages based upon the methodology used in the *Preliminary Results*. I&D Mem. at 22–23. Commerce explained:

> [t]he months of the [period of review] do not allow for them to be divided equally into quarters. Therefore, Commerce reasonably relied on the partial quarter [i.e., June 2018]. To do otherwise would have required Commerce to rely on data outside the [period of review] or to ignore data inside the [period of review]. As there is no reason to believe that Icdas['s] costs, as recorded in [its] normal books and records for the month of June 2018 are unreliable, [Commerce] will continue to rely on the reported June 2018 [cost of manufacturing] data for these final results.

*Id*. at 23. Commerce also rejected RTAC's arguments that variances in Icdas's June 2018 production experience rendered the data unreliable. *See id.*; Final Results

Analysis Mem. [for] [Icdas], (Mar. 13, 2020) ("Icdas Final Analysis Mem.") at ECF pp. 218–19, CR 430–36, PR 210, CJA Tab 18.[7]  Based on changes to Icdas's and Kaptan Demir's margin programs which are not relevant here, Commerce calculated final antidumping margins of 0.00 percent for both mandatory respondents and assigned the non-examined companies a rate of 0.00 percent.  *See Final Results*, 85 Fed. Reg. at 15,766.

## DISCUSSION

### I. Legal Framework

Commerce calculates the normal value of the subject merchandise based on home market sales that are made "in the ordinary course of trade."  19 U.S.C. § 1677b(a)(1)(B)(i).  Commerce disregards sales at prices that are less than the cost of production, *id*. § 1677b(b)(1), because those sales are not made in the ordinary course of trade, *id*. § 1677(15)(A).  A major component of the cost of production is the cost of manufacturing.  *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011).  The cost of manufacturing equals the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  19 U.S.C. § 1677b(b)(3)(A).  The cost of production is the cost of manufacturing plus "selling, general, and administrative expenses" incurred during production and sale of the foreign like product and "the cost

---

[7] The Icdas Final Analysis Memorandum lacks internal pagination; thus, the court refers to the ECF page numbers provided in the confidential joint appendix.

of all containers and coverings . . . and all other expenses incidental to placing the foreign like product in condition packed and ready for shipment." *Id.* § 1677b(b)(3)(B)–(C).

"The statute does not define the time period over which cost of production is to be calculated and over which respondent's various costs must therefore be averaged. Consequently, Commerce must select an appropriate time period for averaging the costs involved." *Pastificio Lucio Garofalo, S.p.A. v. United States*, 35 CIT 630, 633, 783 F. Supp. 2d 1230, 1234 (2011), *aff'd* 469 F. App'x 901 (Fed. Cir. 2012). "Commerce is afforded considerable discretion in formulating its practices in this regard." *SeAH Steel Corp. v. United States*, 34 CIT 605, 617, 704 F. Supp. 2d 1353, 1363 (2010) (citation omitted). Commerce's practice is to calculate the cost of production using a single averaging period covering the entire period of investigation or review. *See* Issues and Decision Mem. for the Final Results of the Second Admin. Review of Carbon and certain Alloy Steel Wire Rod from Canada, A-122-840, (Jan. 24, 2006) at 17–18, *available at* https://enforcement.trade.gov/frn/summary/canada/E6-823-1.pdf (last visited Apr. 6, 2021). In many situations, this results in Commerce using a 12-month average. *Cf. Habaş*, 361 F. Supp. 3d at 1324 ("Commerce's usual methodology is to rely on an annual weight-average cost for the period of investigation.") (internal quotation marks omitted). However, Commerce will depart from its normal practice "and employ[] shorter (usually quarterly) cost-averaging periods" when two conditions are met: "(1) consistent and significant cost variation during the period of review, and (2)

Court No. 20-00071 Page 10

evidence of linkage between the cost variation and changes in sales prices within the shorter averaging period." *SeAH Steel*, 34 CIT at 610–11, 704 F. Supp. 2d at 1358.

## II. Analysis

### A. RTAC's Challenge to Commerce's Methodology

#### 1. Parties' Contentions

RTAC challenges Commerce's methodology in conducting the quarterly cost averaging analysis on two grounds. First, RTAC contends that Commerce has a practice of not examining monthly averages in determining whether to depart from using period-wide average costs and that Commerce deviated from this practice without providing sufficient explanation. *See* RTAC's Mem. at 13, 15, 18, 20, 23–24; Oral Arg. at 3:27–4:19, *available at* https://www.cit.uscourts.gov/sites/cit/files/030821-20-00071-MAB.mp3 (last accessed Apr. 6, 2021) (approximate time stamp from recording). In support of this assertion, RTAC cites four Commerce determinations in which Commerce allegedly stated that monthly averages were not appropriate for consideration in determining whether to depart from period-wide average costs. *See* RTAC's Mem. at 13; RTAC's Reply at 3–4.[8] Second, RTAC contends that Commerce

---

[8] RTAC cites the following determinations: Issues and Decision Mem. for the Final Results of the Antidumping Duty Admin. Review of Stainless Steel Sheet and Strip in Coils from Mexico, A-201-822 (Feb. 3, 2010) ("Mexican Steel IDM") at 32, available at https://enforcement.trade.gov/frn/summary/mexico/2010-2987-1.pdf (last visited Apr. 6, 2021); Issues and Decisions for the Final Results of the Twelfth Admin. Review of the Antidumping Duty Order on Certain Pasta from Italy (2007–2008), A-475-818 (Feb. 2, 2010) ("Italian Pasta IDM") at 18, *available at* https://enforcement.trade.gov/frn/summary/italy/2010-2802-1.pdf (last visited Apr. 6, 2021); Antidumping Duty Admin. Review of Certain Welded Stainless Steel Pipes from the Republic of Korea: Issues and Decision Mem. for the Final Results, A-580-810, (June 22, 2009) ("Korean Pipe IDM") at

did not support its conclusion that relying on the June 2018 data as the sixth quarter was necessary to avoid including data outside the period of review or excluding data inside the period of review.  *See* RTAC's Mem. at 12.

The Government and Icdas counter that Commerce does not have the practice RTAC describes and that the agency determinations RTAC cites are inapposite.  *See* Gov't's Resp. at 11; Icdas's Resp. at 8.  Next, the Government avers that Commerce reasonably explained its decision not to exclude the June 2018 data or include non-contemporaneous data.  Gov't's Resp. at 14–15; *see also* Icdas's Resp. at 9–10.  The Government contends that Commerce adhered to the statutory language directing it to consider all manufacturing costs incurred during the period of review.  Gov't's Resp. at 14; *cf.* Icdas's Resp. at 9.

### 2. Commerce's Methodology in Conducting the Quarterly Cost Averaging Analysis is in Accordance with the Law.

#### a. Agency Practice

When Commerce considers whether to use quarterly cost averages, it is often able to divide the period of review into four three-month quarters, because each review of an antidumping duty order, excluding the first, normally covers a period of 12 months.  *See* 19 C.F.R. § 351.213(e)(1)(i).  However, the first administrative review period may exceed 12 months because the agency's regulations provide a different starting point

---

9, *available at* https://enforcement.trade.gov/frn/summary/korea-south/E9-15492-1.pdf (last visited Apr. 6, 2021); Issues and Decision Mem. for the Antidumping Duty Admin. Review on Certain Steel Concrete Reinforcing Bars from Turkey – April 1, 2006, through March 31, 2007, A-489-807 (Nov. 3, 2008) ("Turkish Rebar IDM") at 18, *available at* https://enforcement.trade.gov/frn/summary/turkey/E8-26623-1.pdf (last visited Apr. 6, 2021).

for that period.  *See id.* § 351.213(e)(1)(ii) (providing that the first administrative review "will cover . . . entries, exports, or sales during the period from the date of suspension of liquidation under this part or suspension of investigation to the end of the month immediately preceding the first anniversary month").  Consequently, in a first administrative review, the number of months in the period of review may not be evenly divisible by three, leaving a remainder period of less than a full quarter.

This combination of circumstances—a request to use quarterly costs during a first administrative review when the period of review is not evenly divisible by three—occurs infrequently, and thus, Commerce has limited practice regarding such remainder periods.  *Cf.* Oral Arg. at 28:24–29:45 (wherein the Government explained that determinations involving the factual and procedural circumstances at issue are few; discussing Issues and Decision Mem. for the Final Results of the Antidumping Duty Admin. Review of Certain Corrosion-Resistant Steel Products from Taiwan, 2016–2017, A-583-856 (Dec. 10, 2018) ("Taiwan Steel IDM") at 8, *available at* https://enforcement.trade.gov/frn/summary/taiwan/2018-27244-1.pdf (last visited Apr. 6, 2021)).

The rarity with which this scenario occurs underscores the flaw in RTAC's agency-practice argument.  RTAC cites four Commerce determinations in an effort to demonstrate that the agency has a practice of finding monthly averages unsuitable for consideration in determining whether to depart from using period-wide average costs.  *See* RTAC's Mem. at 13 (citations omitted); *supra* note 8.  But in all the determinations RTAC cites, the periods of review were 12 months long and, therefore, could be evenly divided into quarters.  Thus, Commerce did not consider the issue presented in this

Court No. 20-00071 Page 13

case: whether the agency may consider a remainder period of one month as representative of a three-month quarter when the period of review cannot be evenly divided into quarters.[9]  Rather, Commerce expressed its preference for using quarterly averages over monthly averages for the entire period of review in situations in which the period of review could be evenly divided into quarters.  *See, e.g.*, Mexican Steel IDM at 32.  Despite RTAC's argument to the contrary, Commerce has not indicated that this preference extends to remainder-period data covering one month.  *See* RTAC's Reply at 8–9.  Consequently, RTAC has failed to establish that Commerce has a practice of finding remainder-period data covering one month unsuitable for consideration to determine whether to depart from period-wide average costs.[10]  Thus, the court rejects RTAC's argument that Commerce deviated from established practice and failed to provide an explanation for so doing.[11]

---

[9] In fact, in the determinations cited by RTAC, the interested parties did not argue for monthly averages to be used.  *See* Mexican Steel IDM at 17–18 (respondent challenged Commerce's reliance on quarterly averages instead of annual averages); Italian Pasta IDM at 12 (respondent challenged Commerce's reliance on quarterly averages as opposed to annual averages or six-month averages); Korean Pipe IDM at 2 (respondent asserted that Commerce lacked "grounds for inferring that quarterly average costs are more accurate than are annual averages costs . . . if there is no direct linkage between changes in costs and changes in selling prices during the same quarter"); Turkish Rebar IDM at 12 (respondent argued that Commerce should use quarterly averages instead of annual averages).

[10] As a methodological issue, RTAC also has failed to establish that Commerce has a practice of considering the "suitability" of data in evaluating whether to depart from period-wide average costs.  *See, e.g.*, RTAC's Mem. at 11.  To the extent that RTAC contends that the June 2018 data were not suitable as a factual matter, the court explains below that substantial evidence supports Commerce's reliance on the data.

[11] The Government contends that RTAC did not exhaust its administrative remedies in challenging Commerce's alleged deviation from agency practice in relying on the June

Court No. 20-00071                                                                                                                Page 14

        b. <u>Excluding the June 2018 Data or Considering Non-Contemporaneous Data</u>

RTAC argues that Commerce failed to explain its decision to use the June 2018 data. *See* RTAC's Mem. at 14–15. However, Commerce stated that it relied on the June 2018 data because the period of review could not be evenly divided into quarters and it had no reason to believe that the data were unreliable.[12] I&D Mem. at 23. This explanation is sufficient in light of the discretion afforded to Commerce "to develop a suitable methodology for calculating the costs of production." *Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*, 42 CIT ___, ___, 308 F. Supp. 3d 1297, 1322 (2018). Moreover, the mere existence of an alternative methodology for determining whether to depart from using a single, period-wide average does not establish that the methodology used by Commerce was unreasonable. *See, e.g., JMC Steel Grp. v. United States*, 38 CIT ___, ___, 24 F. Supp. 3d 1290, 1321 (2014) (deferring to the agency's reasonable and factually supported methodologies).

RTAC also seeks to analogize its argument to Commerce's use of "window period" sales in an attempt to explain how Commerce could have considered non-contemporaneous cost data. The term "window period" refers to home market sales made up to 90 days before or 60 days after the U.S. sales that may be matched if there are no comparable home market sales during the same month(s). *See* 19 C.F.R.

---

2018 data. *See* Gov't's Resp. at 11–12. However, the court need not resolve this issue because RTAC fails to demonstrate that Commerce has such a practice.

[12] RTAC does not challenge Commerce's finding that Icdas's normal books and records accurately reflect its June 2018 production experience. *See* RTAC's Reply at 11 ("RTAC's claim is not that Icdas's June 2018 costs were unreliable in the sense of not reflecting Icdas's cost experience in that month."); Oral Arg. at 22:07–22:35.

§ 351.414(f); *Fischer S.A. Comercio, Industria & Agricultura v. United States*, 36 CIT 1604, 1605, 885 F. Supp. 2d 1366, 1370 (2012). The regulation covering window period sales does not contemplate, much less provide for, Commerce's consideration of non-contemporaneous data to determine a respondent's cost of manufacturing and it only allows Commerce to consider window period sales data when there are no more-contemporaneous sales. *See* 19 C.F.R. § 351.414(f). Thus, RTAC's argument lacks merit because there is contemporaneous cost data and the regulation is otherwise inapplicable.

For the foregoing reasons, Commerce's quarterly cost averaging methodology is in accordance with the law.

### B. RTAC's Challenge Based on Variances in the June 2018 Data

#### 1. Parties' Contentions

RTAC contends that Commerce's consideration of the June 2018 data in the quarterly cost averaging analysis was unsupported by substantial evidence in light of variances in Icdas's June 2018 production experience as compared to the rest of the period of review. *See* RTAC's Mem. at 15–24. RTAC contends that Icdas's June 2018 scrap purchases, usage of self-produced billets, production volume, and the divergence between Icdas's imported scrap purchase prices and its total cost of manufacturing indicate that Icdas's cost data are likely distorted. *See id*. at 16–22.

The Government and Icdas contend that Commerce sufficiently explained that RTAC's analyses of the variances were flawed, and thus, the agency appropriately rejected RTAC's claims that the data were distorted. Gov't's Resp. at 19–25; *see also*

Court No. 20-00071 Page 16

Icdas's Resp. at 7–9.  The Government also contends that RTAC's assessment of the divergence should be rejected as new factual information not submitted to Commerce.  Gov't's Resp. at 22.

### 2. Substantial Evidence Supports Commerce's Finding that the June 2018 Data were Reliable

In finding Icdas's June 2018 cost data reliable, Commerce rejected RTAC's contentions that the data were unsuitable given the abovementioned variances.  *See* I&D Mem. at 22–23; Icdas Final Analysis Mem. at ECF pp. 218–19.  Specifically, Commerce found that RTAC's comparison of Icdas's scrap purchases to Icdas's total raw material costs was flawed because Icdas's total raw material costs consisted of more than just scrap and because RTAC compared scrap purchases determined on different bases.  *See* Icdas Final Analysis Mem. at ECF pp. 218–19.[13]  Commerce explained that a small variance in Icdas's use of self-produced billets in June 2018 did not disqualify the data from consideration.[14]  *See id.* at ECF p. 219.  Similarly, Commerce concluded that the June 2018 data were reliable despite a minor difference in production volume.[15]  *See id*.

---

[13] RTAC's assertion that Commerce did not engage with the substance of its argument ignores the reasoned explanation Commerce provided for assigning the arguments little weight.  *See* Icdas Final Analysis Mem. at ECF pp. 218–19.

[14] Specifically, Commerce concluded that Icdas's [[      ]] reliance on self-produced billets in June 2018 was not representative of a [[        ]] in the company's production processes because "Icdas self-produced more than [[   ]] percent of billets used . . . during the [period of review]."  *Id.* at ECF p. 219.

[15] Commerce explained that the volume of rebar that Icdas produced in June 2018 ([[           ]]) was similar to the average-monthly production quantities in the [[      ]] quarters of the period of review, [[         ]].  *Id.* (citation omitted).

Court No. 20-00071 Page 17

Before the court, RTAC repeats the contentions Commerce rejected. *Compare id.* at ECF pp. 216, 218–19, *with* RTAC's Mem. at 15–21. Thus, RTAC does little more than ask the court to reweigh the evidence considered by Commerce. This the court will not do. *See Haixing Jingmei Chem. Prods. Sales Co. v. United States*, 42 CIT \_\_\_, \_\_\_, 335 F. Supp. 3d 1330, 1346 (2018) (citing *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)).

Additionally, Commerce dismissed RTAC's claim that the June 2018 data were distorted based on the divergence between Icdas's cost of manufacturing and import scrap prices for June 2018 as compared to the full quarters of the period of review because RTAC's analysis "compare[d] scrap prices in [U.S. dollars] to Icdas's reported costs in Turkish lira." Icdas Final Analysis Mem. at ECF p. 219. Commerce concluded that the actual divergence was smaller than RTAC claimed. *Id*. While RTAC asserts that the agency's finding concerning comparisons of values in different currencies misses the mark, *see* RTAC's Mem. at 21–22 & n.8, it does not point to record evidence undermining the agency's conclusion that RTAC overstated the divergence,[16] *see* Icdas

---

[16] RTAC argues that Commerce's formula for computing the divergence was inaccurate. *See* RTAC's Mem. at 21–23. But Commerce considered the calculations provided during the administrative review and explained that RTAC inaccurately calculated the divergence. *See* Icdas Final Analysis Mem. at ECF p. 219. RTAC now offers the court alternative calculations not provided to Commerce in an attempt to undermine the agency's conclusion. *Compare* Rebuttal Br. of [Icdas], (Feb. 18, 2020) at 16, CR 419, CJA Tab 16, *with* RTAC's Mem. at 23. Although the data underlying RTAC's new calculations were in the record, the calculations and revised arguments based on these calculations were not. Thus, RTAC's argument highlights its own failure develop the record, not a failure in Commerce's assessment of the record before it. "It is the responsibility of interested parties—not Commerce—to build the factual record

Final Analysis Mem. at ECF p. 219.  The court is satisfied that substantial evidence supports Commerce's conclusion on this issue.[17]

For the foregoing reasons, the court finds that Commerce's reliance on the June 2018 cost data as the sixth quarter for purposes of its quarterly cost averaging analysis is supported by substantial evidence.

### C. RTAC's Challenge to the Rate for Non-Individually Examined Respondents

Finally, RTAC asks the court to remand the rate Commerce assigned non-individually examined respondents.  RTAC's Mem. at 24.  According to RTAC, Commerce erred in conducting the quarterly cost averaging analysis, and, as a result, the rate assigned to non-individually examined respondents, which is based in part on Icdas's rate, is unsupported by substantial evidence and not in accordance with the law.  *See id*. at 24–25; *see generally Final Results*, 85 Fed. Reg. at 15,766 (explaining that Commerce determined the dumping margin for non-individually examined respondents by averaging "the weighted-average dumping margin[s] calculated for the mandatory respondents (i.e., Kaptan Demir and Icdas)").  As discussed above, Commerce's quarterly cost averaging analysis is supported by substantial evidence and in

---

supporting its position." *Calgon Carbon Corp. v. United States*, 44 CIT ___, ___, 443 F. Supp. 3d 1334, 1345 (2020) (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).

[17] RTAC also contends that the fact that Commerce calculated a divergence in scrap prices in June 2018 (albeit a smaller divergence than RTAC calculated) demonstrates the unreasonableness of Commerce's reliance on the June 2018 data.  *See* RTAC's Mem. at 21.  But, as the Government points out, RTAC's logic would lead to an absurd result in which "any divergence (no matter how small)" would undermine reliance on remainder-period data.  Gov't's Resp. at 21–22.

accordance with the law; consequently, the court rejects RTAC's challenge to the rate assigned to non-individually examined respondents.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained. Judgment will enter accordingly.

                                                  /s/     Mark A. Barnett
                                                  Mark A. Barnett, Chief Judge

Dated: April 6, 2021
        New York, New York